UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,                                              Case No. 12-11124
                                Plaintiff,

                                                         Paul D. Borman
v.                                                       United States District Judge

                                                         Mark A. Randon
                                                         United States Magistrate Judge

THE WW GROUP, INC., d/b/a
Weight Watchers,

                                Defendant.
_____/

OPINION AND ORDER DENYING DEFENDANT'S AMENDED
MOTION FOR SUMMARY JUDGMENT (ECF NO. 31)

        This matter is before the Court on Defendant The WW Group, Inc. d/b/a Weight Watchers's

Amended Motion for Summary Judgment.   (ECF No. 31.)  Plaintiff filed a response (ECF No. 33)

and Defendant filed a reply (ECF No. 34).  The Court held a hearing on August 14, 2013.  For the

reasons that follow, the Court DENIES Defendant's motion.

**INTRODUCTION**

        The Equal Employment Opportunity Commission ("EEOC") has filed this claim of

pregnancy discrimination against Defendant The WW Group, Inc. ("WW") claiming that WW

discriminated against its Charging Party, Wendy Lamond-Broughton ("Broughton"), on the basis

of her sex by refusing to hire her as a WW group leader because she was pregnant.  WW responds

that Broughton was not qualified for employment with WW because she was not at her goal weight

when she sought to apply.  WW claims to have a goal weight policy that requires anyone applying

for a position as a group leader or receptionist (positions in which Broughton expressed an interest)

1

to be at goal weight when they apply.  WW also has a separate staff goal weight policy for existing staff, not applicable to Broughton as prospective staff, that includes certain exceptions for pregnant and nursing women who exceed their goal weight during and after pregnancy.  It is undisputed that Broughton was pregnant and was not at her goal weight when she expressed an interest in applying for employment with WW.

The EEOC does not challenge the WW applicant goal weight policy, nor does it claim that the policy adversely affects pregnant women as a group (this is not a disparate impact claim).  The EEOC argues only that with respect to this claimant, the WW violated Title VII, and specifically the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k) ("the PDA"), by informing Broughton that she need not bother interviewing for a position as a group leader because WW did not hire pregnant women.  For purposes of summary judgment, WW concedes that these discriminatory remarks were made to Broughton and they therefore assume *arguendo* for purposes of their motion that the EEOC has produced direct evidence of pregnancy discrimination, i.e. that Broughton was informed by a WW employee that WW does not hire pregnant women and that she therefore need not bother to apply.   The grounds for WW's motion are very narrow and relate solely to Broughton's qualifications to perform the job of a group leader or receptionist.  WW argues that despite direct evidence that Broughton was refused an opportunity to interview for a position because she was pregnant, the EEOC cannot succeed on its Title VII claim because it is undisputed that Broughton was not at goal weight when she sought employment, that she was therefore unqualified for the position and that there is no genuine issue of material fact that WW would not have hired Broughton even in the absence of any discriminatory motive.

## I.   BACKGROUND

Broughton was a Lifetime Member of WW and thus eligible to apply for employment with WW.  (Def.'s Mot. Ex. 4, Invitation to Lifetime Membership.)  A WW member becomes a "Lifetime Member," and thus eligible for employment and other privileges, by maintaining a "goal weight" for six consecutive weeks.  *Id*.  A member's "goal weight" is a specific weight chosen by the member as his or her personal goal weight and must fall within a set "goal weight range" that is determined by body mass index (BMI) guidelines based upon an individual's height and age.  (Def.'s Mot. Ex. 3, WW Position Statement to the EEOC, Ex. 1, Weight Watchers Weight Ranges for Adults; Def.'s Mot., ECF No. 31-22, March 26, 2013 Deposition of Robin Bingham 28.)  A WW member may change his or her goal weight as long as the chosen weight falls within the goal weight range for their height and age.  (Bingham Dep. 34.)  The member must submit paperwork and receive approval before making an official change to their chosen goal weight.  (*Id*.)  WW claims that it requires all applicants for employment to be at their personal goal weight in order to be considered for employment, although several WW documents indicate that an applicant must be within "goal range" to apply for employment.  (Pl.'s Resp. at 4; Ex. 9, Bingham Dep. 30, 46, 48; Def.'s Mot. Ex. 4, WW Invitation for Employment; Def.'s Mot. Ex. 7, Employment Opportunity Card.)

Broughton had been a member of WW for several years, and attended WW meetings in various cities where she had lived.  (Pl.'s Mot. Ex. 4, June 3, 2013 Affidavit of Wendy Lamond-Broughton ¶¶ 3-6.)  At 5'9" tall, the upper end of Broughton's WW BMI goal weight range was 169.  (*Id*. ¶¶ 2, 23.)  Broughton was very successful in dropping weight on the WW program and in maintaining her goal weight, becoming a Lifetime Member in July, 2005, after having adequately

3

maintained her goal weight of 154.  (*Id*. ¶ 7.)  In August, 2008, Broughton gave birth to her first child, having gained 30 pounds in the course of the pregnancy.  Broughton was able to drop that weight and return to her new goal weight of 164 (still within her goal weight range) by December, 2008.  (*Id*. ¶¶ 9-11.)  In May, 2009, Broughton became pregnant with her second child and at that time weighed in at 154.6 pounds, 9.4 pounds below her goal weight.  (*Id*. ¶¶ 13-14.)  On July 23, 2009, four months into her pregnancy, Broughton weighed in at 162 pounds and stopped attending WW meetings because of WW's policy against allowing pregnant members to continue to participate in the WW weight loss program.  (*Id.* ¶ 15.)

In March, 2009, before becoming pregnant with her second child, Broughton, as a Lifetime Member interested in employment with WW, submitted an Employment Opportunity Reply Card, expressing her interest in becoming a WW group leader or receptionist.  (*Id*. ¶¶ 7, 12; Def.'s Mot. Ex. 7, Broughton's Employment Opportunity Reply Card.)  Broughton did not receive an immediate response to her employment opportunity inquiry.  (Broughton Aff. ¶ 14.)

On September 14, 2009, Broughton received a call from Carolyn Bough, the Detroit Area Manager for WW, informing Broughton that WW had received her Employment Opportunity Reply Card and inviting her to attend an information session for interested individuals the next morning at 9:30 a.m.  (Broughton Aff. ¶ 17.)  According to Broughton, she called Bough back later that morning and left a message informing Bough that she was pregnant but was still interested in a job with WW.  (*Id*.)  According to Broughton, Bough returned Broughton's call later that afternoon and informed Broughton that it was not worth coming to the interview session because WW did not hire pregnant women.  (*Id*. ¶ 18.)  According to Broughton, Bough told her that by the time WW finished training her, Broughton would be off work to have her baby.  (*Id*.)  During this conversation,

4

according to Broughton, Bough did not ask nor did Broughton offer any information regarding her goal weight, her goal weight range or her weight at the time. (*Id*. ¶ 19.) Broughton and Bough spoke again later that evening and Bough again informed Broughton that she would not be hired because she was pregnant and because her pregnancy caused her to be over her BMI weight range. According, to Broughton, Broughton did not offer information regarding her height, weight, BMI range or her present weight during that conversation. (*Id*. ¶ 20.) Bough explained to Broughton that a person who is already working for WW when they become pregnant can remain employed but that no one can be hired while pregnant. (*Id*. ¶ 21.) According to Broughton, Bough was not interested in Broughton's success in the WW program or the fact that Broughton had always maintained her goal weight prior to becoming pregnant and in fact was at her lowest weight ever, 154.6, before becoming pregnant with this second child. (*Id*. ¶ 21.)

Bough's recollection of her communications with Broughton are quite different. According to Bough, Broughton never left a voicemail message for Bough and therefore Bough's testimony is that Broughton never mentioned in a phone message that she was pregnant. According to Bough, when she first spoke with Broughton on the phone, she first asked Broughton what her current and goal weights were before learning that Broughton was pregnant. According to Bough, she then informed Broughton that she needed to be at goal weight to attend the interview session and apply for a position. Bough understood from Broughton that her weight gain was due to her pregnancy but explained to Broughton that nonetheless she must be at goal weight to attend the information session. (Pl.'s Resp. Ex. 7, Bough Dep. 25-29.)

Given her long term success on the WW program, Broughton was upset at being told that her pregnancy prevented her from being considered for employment with WW, and asked for the

5

name of a person she could contact in WW's Human Resources Department. ( Broughton Aff. ¶ 22.) Broughton was trying to understand why Bough said she was being rejected simply because she was pregnant. She explained to Bough that she weighed 169 pounds, a weight that was still within her goal range, even though she was five months pregnant. (*Id.* ¶¶ 22, 23.) Bough told Broughton that she would check with Human Resources and get back to Broughton the next morning. (*Id.* ¶ 24.) According to Broughton, she received no further communication from Bough until late the next day, after the information session had occurred, informing Broughton that Bough would let her know when WW was having another information session that Broughton could attend. (*Id.* ¶ 25.)

Broughton had no further conversations with Bough. (*Id.*) Broughton admits that at the time she spoke with Bough, she was 5 pounds over her goal weight of 164, but submits that she was still within her goal weight range and that the sole reason for her weight being over her personal goal weight was that she was in her fifth month of pregnancy. (*Id.* ¶ 25.) According to Broughton, had she not been pregnant, she would have continued her success with the WW program and would have maintained her goal weight. (*Id.*) Broughton never attended an information session and did not apply for employment.

Although WW asserts that Broughton never actually applied for employment, they appear to accept *arguendo* that the discriminatory conduct that prevented her from submitting an application can constitute actionable conduct under Title VII. *See, e.g. Ferdinand-Davenport v. Children's Guild*, 742 F. Supp. 2d 772, 780 (D. Md. 2010). "The *McDonnell Douglas* framework only demands that a plaintiff seek to apply, rather than actually apply, to an open position. . . . On the facts pled by Davenport, it is plausible that she applied or sought to apply for an open position." *Id.* So too here. Bough did approach Amy Brozgold in Human Resources after speaking with

Broughton and asked Brozgold how to handle an inquiry from a Lifetime Member who wished to attend an information session but was over goal weight due to her pregnancy.  (Def.'s Mot., ECF No. 31-24, March 26, 2013 Deposition of Amy Brozgold 54-55.)  Brozgold instructed Bough to inform Broughton that she could absolutely attend an information session regardless of her pregnancy status.  (*Id*. at 55.)  Ms. Brozgold explained that although Broughton was welcome, as a Lifetime Member, to attend the information session, she would have to be at goal weight to be hired, regardless of the fact that she was pregnant.  (*Id*. at 45-47.)  WW has no policy to address one way or the other the situation of an applicant who is above goal weight due to pregnancy.  (*Id*. at 47.)  In fact, unlike the WW Staff Goal Weight Policy covering those already employed with WW, the applicant goal weight policy is unwritten.

WW's Staff Goal Weight Policy applies to all WW staff members who have contact with the public and requires such staff to maintain their weight "at goal" throughout their employment:

> Affected staff members are required to maintain their weight "at goal."  At goal is defined as within 5 pounds of the established Lifetime Member goal weight not to exceed the maximum recommended weight for all adults at that height.  This specific weight must be within Goal Range established by Weight Watchers International as appropriate for the staff member's height and age.  Currently this range is based on the Body Mass Index (BMI) for healthy weight developed and based on scientific and medical data relating to obesity and risk of disease associated with being overweight.

(Def.'s Mot. Ex. 1, Staff Goal Weight Policy, Section 2.)  If a staff member who is required to comply with the Staff Goal Weight Policy weighs in above goal, the staff member receives counseling and a limited opportunity to move back to goal weight before being placed on an unpaid leave of absence and ultimately discharged for failure to maintain goal weight.  (*Id*. Section 5.)

WW justifies its Staff Goal Weight Policy as being necessary to promote the success of the WW weight loss and control principles and to support the credibility of the program:

7

[W]e must also recognize that to our members, the Weight Watchers staff are the embodiment of the weight loss and control principles that the members are there to learn and follow.  In other words, we are role models for our members and are examples that the Weight Watchers program works!

An overweight staff person, however charismatic and likable, can raise questions in members minds as to the credibility of the Weight Watchers weight reduction program.  To this end, the following Staff Goal Weight Policy and Procedures have been established for <u>all</u> staff who have contact with members in the meeting room and general public.  This policy applies across the board to all applicable staff, with no exceptions, in order to promote fair and equal treatment.

*     *     *

We have an obligation to our members and the public to follow the Weight Watcher program because we are role models.  If we are to promote this program, we must believe in it and follow it ourselves.

The general public have the right to question our credibility as a company when our employees are obviously not following the program we claim is an effective method of weight management.

Therefore, there are legal, moral and ethical reasons to have a staff goal weight policy.

Def.'s Mot. Ex. 1, Staff Goal Weight Policy Section 1, 3.

Notably, a special exception to the Staff Goal Weight Policy is made for pregnant and nursing staff members, accommodating their pregnancy related and nursing weight gain:

Pregnant staff will be allowed to work in their meetings until their doctor recommends they stop working before delivery.  However, they should maintain their weight within their doctor's recommended weight range in order to stay in their meetings.  While on leave of absence, staff members should continue to weigh monthly.  Nursing staff members should stay within their doctor's recommended weight range for nursing mothers.

Before being allowed back into meetings, staff members must weigh in with their Manager.  A goal weight conference will be held to establish a specific plan for getting back to goal after pregnancy/nursing is complete.  At that time, the policy, as stated in Section 5, will become effective.

Def.'s Mot. Ex. 1, Staff Goal Weight Policy, Section 6.

To reiterate: WW's "applicant goal weight policy," unlike its "staff goal weight policy," is unwritten.  The Employment Opportunity Reply Card that prospective applicants fill out states that "prospective staff must have a body weight that is within the Weight Watchers goal range."  (Def.'s Mot. Ex. 7, Employment Opportunity Reply Card.)   According to the testimony of the WW witnesses, in practice an applicant must be at "goal weight," not "within goal range" and applicants are told verbally that they must be at or below "goal weight" to be considered for employment:

Q:    Okay. And does this staff goal weight policy apply to applicants?
A:    No.
Q:    Is there a separate goal weight policy that is limited to applicants?
A:    Verbally we tell them, yes, you have to be at your goal weight to work for us.
Q:    But is there a formal document entitled goal weight policy applicable to applicants?
A:    No.
Q:    Is there a formal document that's intended to reflect a goal weight policy that's limited to applicants?
A:    No.
Q:    You say that the staff goal weight policy doesn't apply to applicants.  What's the basis for your testimony in that regard?
A:    Specifically, once somebody works for Weight Watchers, if they happen to get into a little bit of trouble with their weight, we do everything we can to help that person get that weight off again.  And so it's very – time consuming and it's very supportive and nurturing to help that person.
Q:    I guess what I'm wondering is what's the basis for your testimony that this policy cannot benefit applicants, I guess?
A:    Well, it's just not designed for applicants, and so it's not just that it wouldn't be beneficial or beneficial [sic] it's just not for them; it's for the staff only.
Q:    Is there anything in writing in a company documents which clearly indicates that this policy is simply not for applicants?
A:    Are you asking me is it in writing somewhere that the staff goal weight policies and procedure is not for applicants, is that phrase in writing?
Q:    Yes.
A:    Not to my knowledge.

ECF No. 31-22, Def.'s Mot. Bingham Dep. 46-47.

At the time that Broughton received the phone call from Bough in response to her expression of interest in employment with WW, the upper end of the WW goal weight range for Broughton's

9

height and age was 169, Broughton's personal goal weight was 164 and her actual weight, according to her affidavit, was 169, above her personal goal weight but still within her WW BMI goal range.[1]

## II.     STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56, a party against whom a claim, counterclaim, or cross-claim is asserted may file a motion for summary judgment "at any time until 30 days after the close of all discovery," unless a different time is set by local rule or court order.  Fed. R. Civ. P. 56(b).  Summary judgment is appropriate where the moving party demonstrates that there is no genuine dispute as to any material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a).  "Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings,

---

[1] WW asserts that Broughton in fact weighed 172 pounds at the time she expressed an interest in employment with WW, which put her both beyond her personal goal weight and outside of her BMI goal range.  As evidence of Broughton's weight at the time, WW relies on an email that Broughton drafted on April 5, 2010, in connection with the EEOC proceedings, in which she stated:  "The weight watchers healthy upper end of the range for my height is 169.  With a goal weight/maintenance weight of 164 . . . the weight of my baby alone put me over 172, thus over their range."  (Def.'s Mot. Ex. 20, 4/5/2010 Email From Broughton to Lolita Davis at the EEOC.)  However, the date on which Broughton may have reached a weight of 172 is unclear from this email and Broughton has testified in her Affidavit that she weighed 169 pounds (within her WW BMI range) at the time she spoke with Bough about attending an information session.

*Importantly, WW did not depose Broughton before filing its summary judgment motion to ascertain the basis for this discrepancy*.  Viewing the facts in the light most favorable to the Plaintiff, as the Court must on summary judgment, the Court must assume that Broughton's weight was 169, as set forth in her affidavit, on the date she was told by Ms. Bough not to bother attending the information session due to her pregnancy.

Additionally, there is some dispute regarding Broughton's height (she claims she is 5'9" which would put her upper end weight at 169), WW infers she was 5'8" which would put her weight of 169 above the upper end of her WW goal weight range of 164 (if Broughton were 5'8").  (Def.'s Mot. Ex. 3, EEOC Position Statement, Ex. 1, Weight Watchers Weight Ranges For Adults.)  Again, this discrepancy was never addressed in discovery and, viewing the facts in the light most favorable to the Plaintiff, the Court assumes that Broughton was 5'9" and that the upper end of her weight range was 169.

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,'

which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at

323. *See also Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987).

A fact is "material" for purposes of a motion for summary judgment where proof of that fact

"would have [the] effect of establishing or refuting one of the essential elements of a cause of action

or defense asserted by the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)

(quoting Black's Law Dictionary 881 (6th ed. 1979)) (citations omitted). A dispute over a material

fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Conversely,

where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material

fact for trial. *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993). In making this

evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the

non-moving party. *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984). "'The

central issue is whether the evidence presents a sufficient disagreement to require submission to a

jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Binay v.

Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010) (quoting *In re Calumet Farm, Inc.*, 398 F.3d 555, 558

(6th Cir. 2005)).

If this burden is met by the moving party, the non-moving party's failure to make a showing

that is "sufficient to establish the existence of an element essential to that party's case, and on which

that party will bear the burden of proof at trial," will mandate the entry of summary judgment.

*Celotex*, 477 U.S. at 322-23. The non-moving party may not rest upon the mere allegations or

denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must

11

set forth specific facts which demonstrate that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e).

The rule requires the   non-moving party to introduce "evidence of evidentiary quality"

demonstrating the existence of a material fact.  *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135,

145 (6th Cir. 1997); *see Anderson*, 477 U.S. at 252 (holding that the non-moving party must produce

more than a scintilla of evidence to survive summary judgment).  "A genuine issue of material fact

exists if a reasonable juror could return a verdict for the nonmoving party."  *Pucci v. Nineteenth*

*Dist. Ct.*, 628 F.3d 752, 759 (6th Cir. 2010).

"Rule 56(e)(2) leaves no doubt about the obligation of a summary judgment opponent to

make [his] case with a showing of facts that can be established by evidence that will be admissible

at trial. . . . In fact, '[t]he failure to present any evidence to counter a well-supported motion for

summary judgment alone is grounds for granting the motion.'  Rule 56(e) identifies affidavits,

depositions, and answers to interrogatories as appropriate items that may be used to support or

oppose summary judgment."  *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (quoting

*Everson v. Leis*, 556 F.3d 484, 496 (6th Cir. 2009)).

"In reviewing a summary judgment motion, credibility judgments and weighing of the

evidence are prohibited. Rather, the evidence should be viewed in the light most favorable to the

non-moving party."  *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009) (citing

*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986)).  "Thus, the facts and any inferences that

can be drawn from those facts [ ] must be viewed in the light most favorable to the non-moving

party."  *Id*. (alteration in original) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475

U.S. 574, 587 (1986) and *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005)).

## III.   ANALYSIS

The EEOC brings its claim under Title VII, 42 U.S.C. § 2000e-2(a)(1), which makes it unlawful for an employer "to fail or refuse to hire . . . any individual, or otherwise discriminate against any individual . . . because of such individual's . . . sex."   Under the Pregnancy Discrimination Act ("PDA"), 42 U.S.C. § 2000e(k), the term "because of sex" includes "because of or on the basis of pregnancy, childbirth or related medical conditions."   The EEOC guidelines interpreting the PDA, which are accorded a high degree of deference under *Griggs v. Duke Power*, 401 U.S. 424, 433-34 (1971), provide in part:

> The basic principle of the Act is that women affected by pregnancy and related conditions must be treated the same as other applicants and employees on the basis of their ability or inability to work.  A woman is therefore protected against such practices as being fired, or refused a job or promotion merely because she is pregnant . . . .

29 C.F.R. App. § 1604 (1986).  *See Turic v. Holland Hospitality, Inc.*, 85 F.3d 1211, 1213 (6th Cir. 1996) ("The EEOC guidelines interpreting [the PDA], [] are entitled to a high degree of deference under *Griggs v. Duke Power*, 401 U.S. 424, 433-34, 91 S.Ct. 849, 854-55, 28 L.Ed.2d 158 (1971)").  "The PDA was enacted for a second and broader purpose as well, namely, to prevent the differential treatment of women in all aspects of employment based on the condition of pregnancy."  *Carney v. Martin Luther Home, Inc.*, 824 F.2d 643, 646 (8th Cir. 1987).  "In using the broad phrase 'women affected by pregnancy, childbirth and related medical conditions,' the bill makes clear that its protection extends to the whole range of matters concerning the child-bearing process."  *Id*. at 647-48 (quoting H.R. Rep. No. 95-948 at 5, *reprinted in* Legislative History at 151, U.S. Code Cong. & Admin. News 1978, p. 4753).

WW concedes, for purposes of summary judgment, that Bough's alleged remarks to

13

Broughton informing her that her pregnancy weight gain put her outside her BMI range and therefore ineligible for employment, constitute direct evidence of discrimination. The parties agree that once a plaintiff has produced direct evidence of discrimination, "the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive." *Weigel v. Baptist Hosp. Of East Tenn.*, 302 F.3d 367, 382 (6th Cir. 2002); *See also Jacklyn v. Schering-Plough Healthcare Products Sales Corp*., 176 F.3d 921, 927 (6th Cir. 1999) ("Once there is credible direct evidence, the burden of persuasion shifts to the defendant to show that it would have terminated the plaintiff's employment had it not been motivated by discrimination."). WW argues that even assuming that Bough's remarks were made and constitute direct evidence of discrimination, WW is entitled to summary judgment because there is no genuine issue of material fact (1) that Broughton was not objectively qualified for the job because she failed to meet the goal weight policy for applicants and (2) that WW would not have hired Broughton even in the absence of the alleged discriminatory motive because she was above goal weight at the time she sought employment with WW.

WW's summary judgment argument is quite narrow, limited to the contention that Broughton was unqualified for a position as a group leader or receptionist because she was five pounds above her goal weight at the time she sought employment. WW argues that even assuming *arguendo* direct evidence of discrimination, the EEOC must still establish that Broughton was objectively qualified for the job. WW argues that Broughton was not objectively qualified because she was admittedly above goal weight, in violation of WW's applicant goal weight policy, at the time she applied for

14

employment.[2]   A qualification requirement, although objective, that is totally unrelated to job performance is an insufficient basis on which to refuse to hire an individual.  "At the prima facie stage, a court should focus on a plaintiff's *objective* qualifications to determine whether or not he or she is qualified for the relevant job."  *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 575-76 (6th Cir. 2003) (en banc) (emphasis in original).

In this case, there is at a minimum a question of fact regarding whether the goal weight requirement, as applied to Broughton, was related to her ability to perform the job.  WW concedes that had Broughton been at or below goal weight even though pregnant, she would have been eligible to be hired and would have been considered for a position, all other criteria such as lifetime membership, etc. being met.  (Brozgold Dep. 50-51.)  If hired, she would then have been covered by the staff goal weight policy governing pregnant staff, which would permit her to work as a group leader or receptionist, despite exceeding her goal weight and goal range, as long as her doctor felt it was medically appropriate.  WW also concedes that an applicant could attempt to change her personal goal weight to accommodate her pregnancy weight gain (as long as she remained within her BMI range) and become eligible for employment even though her pregnancy will soon take her

---

[2]  As discussed above, the applicant "goal weight policy" was unwritten.  The WW witnesses, however, testified uniformly to their understanding that applicants had to be "at goal weight" when seeking to be hired.  The Employment Opportunity Card, however, that Broughton signed in this case expressing her interest in employment with WW, states that applicants must be "within goal range" to be considered for employment. Moreover, the literature encouraging Lifetime Members to apply for positions on the WW staff states that "at-goal" members are encouraged to apply and defines "at-goal" as "a body weight within the Weight Watchers goal weight range."  (Def.'s Mot. Ex. 4.)  WW dismisses this "goal range" argument as a "red herring," but clearly there is a factual dispute as to the exact contours of the "unwritten" applicant goal weight policy. If the standard for applicants is "goal range," and if Broughton was within goal range at the time she would have attended the interview session, she would have been objectively qualified for employment even under WW's own definition.

15

above that goal weight after she is hired:

Q:     So my question is, you know, based on your understanding of company policy and procedure, is an applicant's pregnancy taken into consideration when determining whether or not she's qualified for employment based on goal weight?

A:     No.  It's based on the number, based on her goal weight.

Q:     And the fact that she may be pregnant and her weight might be associated with pregnancy is not taken into account.

A:     Correct.

                    *                    *                    *

Q:     Okay. Just to be clear, based on your understanding of the goal weight requirements, if an applicant is pregnant but over goal weight and they apply for employment, what would happen with that person's application?

A:     If they are over goal?

Q:     Yes.

A:     They would not be considered for employment.

Q:     And what if the applicant is pregnant and over goal but within the goal weight range for her height, what would happen with her application?

A:     She would have the option at that point - because the pregnancy quite frankly, is irrelevant.  It's all based on the number.  So if she were to say, I will change my goal weight and it's still within my BMI, then I suppose we would consider her.[3]

Q:     Okay. What would happen if an applicant is pregnant but at her goal weight at the time she applies for employment?

A:     As long as she's at goal weight, we would be - that would be - of course, that would be fine.

Q:     Okay.  So she wouldn't be rejected based on her goal weight?

A:     If she's at her goal weight, that's what we're going to look at.

Q:     Okay.  And she would be eligible for employment, correct?

A:     Correct.

Q:     And that's provided other criteria are met such as regular attendance at meetings and a good interview and things like that?

A:     Correct.

Q:     So she would be eligible - a pregnant woman who is at goal at the time of application would be eligible for employment, even though at a later point in

_____

[3] Assuming that the applicant goal weight policy required an applicant to be at "goal weight," rather than "within goal range," there is a question of fact as to whether or not Broughton, if she had chosen to do so, could have adjusted her personal goal weight to accommodate her pregnancy weight gain, as Bingham suggested in her deposition, and been at goal weight for the interview session.  Because WW opted not to depose Broughton before filing their motion for summary judgment, this and many other questions remain unanswered.

|   | time she's going to gain weight based on her pregnancy? |
|---|---|
| A: | As long as when she applies with us she is at her goal weight, that's what I'm going to look at. That's the only thing I look at at that point with regard to weight, is where she is. Is she at goal weight. |
| Q: | And if that were to happen, I mean, it would be inevitable that such a person would gain weight during the course of pregnancy, right? |
| A: | Correct. Of course. |
|   | *          *          * |
| Q: | In the event that person successfully completes training and there is a vacancy, such person would be hired, right? |
| A: | Yes. I was a pregnant leader. You know, we have it all the time. |

Bingham Dep. 47-50, 51-52.

This testimony demonstrates that when the applicant goal weight policy is applied to a WW Lifetime Member like Broughton, whose above-goal weight at the time she applies is arguably attributable solely to her pregnancy weight gain, the goal weight policy is entirely unrelated to the "legal, moral and ethical reasons" espoused by WW as the basis for requiring applicants to be at goal weight. According to WW, an individual who is over goal weight because they have failed or been unable to adhere to the WW program is an unsuitable candidate for employment because, "however charismatic and likable," their inability to maintain goal weight "can raise questions in members minds as to the credibility of the Weight Watchers weight reduction program." (Def.'s Mot. Ex. 1, Staff Goal Weight Policy.) WW repeated this justification for the applicant goal weight policy at oral argument on this motion, WW counsel stating that WW is in the weight loss industry and cannot have people who are overweight as their spokespersons. But, as Ms. Bingham testified, pregnant group leaders are permitted to continue working and it "happens all the time." Because a group leader who is able to maintain goal weight but gains healthy weight due to pregnancy has no negative impact on the credibility of the WW program, such a person is not inherently an example of a failure of the program's goals or methods at all. Consequently, when applied to a pregnant

17

applicant whose over goal weight is wholly pregnancy related, a question of fact exists as to whether the applicant goal weight policy has a legitimate connection to the applicant's ability to perform the job.

WW makes much of the fact that the EEOC concedes that it is not challenging the applicant goal weight policy in this case. But they need not do so to challenge the application of that policy to Broughton on the facts of this case. A question of fact exists as to whether the objective qualification requirement that an applicant be at goal weight when applying is relevant to job performance in the case of an applicant whose above goal weight is attributable solely to her pregnancy. The policy may well be a valid objective qualification with regard to a different claimant, for example one whose above goal weight could not be entirely attributed to pregnancy and who therefore *would* present a credibility issue as a member of the staff. But this Court is *not* addressing the policy as a whole, or its potential application to other claimants. With respect to Broughton, however, as to whom one could reasonably conclude that her above goal weight was entirely related to her pregnancy, a reasonable juror could conclude that her pregnancy weight gain was entirely unrelated to her ability to be an effective group leader or receptionist, given WW's own concession that pregnant group leaders can effectively continue in their positions without destroying the credibility of the WW program.

WW argues that even assuming direct evidence of discrimination, it has produced sufficient evidence to enable the Court to determine as a matter of law that it would not have hired Broughton even absent the discriminatory animus because the undisputed evidence demonstrates that WW has never made an exception to the applicant goal weight policy and has never hired an individual who was above goal weight. To make its point, WW analogizes to the situation of an African American

who applies for a job as an airline pilot but is denied employment because of his race.  Such an individual would have no claim under Title VII, WW argues, if he lacked a pilot's license, an objective qualification for the job of a pilot, because he could not have been hired for the job regardless of the discriminatory motive for the failure to hire.  This analogy is inapt where there is a genuine issue of material fact regarding the relevance of the alleged objective qualification to a particular applicant's ability to perform the job.  In the case of the pilot, the license is indispensable.  In the case of Broughton, her above-goal weight due to pregnancy, perhaps not so.  Moreover, as discussed further *infra*, the latter is arguably protected by Title VII and the PDA, the pilot's license is a separate and independent non-protected basis for refusing to hire the pilot.

More importantly, however, there is no evidence to support WW's contention that had Broughton not been pregnant (and therefore over goal weight) they would not have hired her.  Had she not been pregnant, presumably given her history with WW and her weight at the time she became pregnant, she would have been at or below goal weight and eligible for hire.  WW has not adequately explained in Broughton's case how they can analytically separate Broughton's pregnancy from her weight gain for purposes of determining whether or not they would have hired her absent the discriminatory motive.  Broughton was told, viewing the facts in the light most favorable to her, by Bough that her pregnancy related weight gain put her over her WW BMI range and therefore ineligible for hire.  According to Broughton, once learning that Broughton was pregnant, Bough did not immediately inquire about Broughton's actual or goal weights before telling her she need not bother to interview because she was pregnant and overweight.  Bough herself, according to Broughton, did not distinguish between the pregnancy and the weight gain.  Absent her pregnancy, a rational trier of fact could conclude, there would have been no weight gain precluding her

19

employment with WW.  There is no evidence establishing that, absent the above goal weight, they would not have hired her.  Therefore, WW has not established that, absent her pregnancy, they would not have hired Broughton.

Even assuming that Broughton was not objectively qualified according to WW's interpretation of its applicant goal weight policy, and that WW would not have hired Broughton notwithstanding an admitted discriminatory motive, this would not end the inquiry in this case. WW's decision to refuse to hire Broughton because her pregnancy put her over her goal weight must still comport with the requirements of the PDA.  WW has failed to adequately address the EEOC's argument that their applicant goal weight requirement cannot trump the provisions of the PDA.  WW states that it has fulfilled its obligations under the PDA by treating Broughton just like all other applicants and that this is all the PDA requires.  (Def.'s Reply 2.)  But the PDA prohibits refusing to hire someone because of the effects of their pregnancy:

> The basic principle of the Act is that women affected by pregnancy and related conditions must be treated the same as other applicants and employees on the basis of their ability or inability to work.  A woman is therefore protected against such practices as being fired, or refused a job or promotion merely because she is pregnant . . . .

29 C.F.R. App. § 1604 (1986).  On the facts of this case, a reasonable juror could conclude that Broughton's weight gain putting her above her goal weight was solely attributable to her pregnancy, that this weight gain was totally unrelated to her ability or inability to perform the job (as evidenced by the fact that WW permits pregnant group leaders to continue to conduct group meetings) and that she was wrongly denied the right to apply for a position with WW.  WW argues that the EEOC cannot question WW's business judgment in adopting an applicant goal weight policy that they deem to be crucial to the credibility of their program.  But application of the policy in the context

20

of this case, where WW's own staff goal weight policy, as explained by Ms. Bingham, demonstrates that pregnant women can be effective group leaders, creates a question of fact as to whether or not a candidate for employment whose weight gain is solely attributable to her pregnancy impugns the credibility of the WW program and as to whether she is, therefore, in fact unqualified for the position.

At oral argument, counsel for WW submitted that if the Court were to consider this notion that Broughton's over goal weight was attributable solely to her pregnancy, the Court must also consider whether WW could establish that the applicant goal weight policy as applied to pregnancy weight gain was a *bona fide* occupational qualification ("BFOQ").[4]   "The BFOQ defense countenances gender-based discrimination 'in those certain instances where . . . sex . . . is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise.'"   *Everson v. Mich. Dep't of Corrections*, 391 F.3d 737, 747-48 (6th Cir. 2004) (quoting 42 U.S.C. § 2000e-2(e) (2001)).   "The burden is on an employer to establish a BFOQ

---

[4]   Counsel for WW claimed at oral argument to have been blind-sided by this argument that Broughton's weight gain was pregnancy related and therefore could only be used as a basis to disqualify her from employment if proven to be job related. This ought not to have been a surprise to WW.   The EEOC's response to WW's summary judgment motion made the argument that "Broughton was excluded from employment because of a pregnancy-related medical condition," and cited *United Auto Workers v. Johnson Controls, Inc.*, 499 U.S. 187, 205 (1991), a seminal case discussing the BFOQ defense, for the proposition that any decision to refuse to employ or hire a pregnant woman must be related to the person's ability to do the work.   (ECF No. 33, Pl.'s Resp. 11.)   Moreover, in its now-withdrawn motion for summary judgment, WW directly addressed the BFOQ issue, offering the same justification there that it offers here, i.e. that the applicant goal weight requirement relates to preserving the credibility of its program by ensuring that its public spokespersons have a demonstrated ability to lose weight and maintain weight loss under the WW program.   (ECF No. 14, Motion for Summ. Judg. 9-10.)   WW made the strategic decision to withdraw that motion and to omit that argument from the instant motion and also chose not to respond to the argument when raised in Plaintiff's response to the instant motion.   WW cannot reasonably claim surprise.

defense." *Everson*, 391 F.3d at 748. "'[I]n order to qualify as a BFOQ, a job qualification must relate to the essence, or to the central mission of the employer's business.'" *Id.* at 749 (quoting *United Auto Workers v. Johnson Controls, Inc.*, 499 U.S. 187, 201 (1991)). "'The validity of a BFOQ turns upon factual findings, preferably ones by a jury.'" *Enlow v. Salem-Keizer Yellow Cab Co., Inc.*, 389 F.3d 802, 807 (9th Cir. 2004) (citing *EEOC v. Boeing Company*, 843 F.2d 1213, 1216 (9th Cir. 1988)).

For the reasons discussed above, as applied to an applicant's over goal weight that is solely occasioned by pregnancy, genuine issues of material fact exist as to whether enforcement of the applicant goal weight policy, when applied to a prospective staff member whose over goal weight is solely attributable to her pregnancy, relates to the essence or mission of WW. *See Carney*, 824 F.2d at 648-49 (finding that employer failed to carry its burden of establishing a BFOQ defense where plaintiff could continue to perform the requirements of her job despite the restrictions placed on her directly arising from her pregnancy). WW admits (for purposes of its summary judgment motion) that it refused to interview Broughton for a position because of her pregnancy. The fact that it has a policy that it claims permits it to discriminate against her on the basis of her pregnancy-related weight gain does not relieve WW of its obligation to comply with the PDA. WW has not produced sufficient evidence to permit a finding that it has established a BFOQ defense as a matter law.

## IV.    CONCLUSION

The Court concludes, given WW's concession of direct evidence of discrimination for purposes of this motion, that genuine issues of material fact persist as to (1) whether the WW applicant goal weight policy required prospective staff to be at their personal goal weight or within

22

their WW goal weight range and whether Broughton was within her WW goal weight range when she sought employment; (2) whether Broughton was qualified for the position; (3) whether WW would have refused to hire Broughton notwithstanding her pregnancy; and (4) whether the applicant goal weight policy as applied to Broughton is a *bona fide* occupational qualification.

Accordingly, the Court DENIES WW's Amended Motion for Summary Judgment.  (ECF No. 31.)

IT IS SO ORDERED.

s/Paul D. Borman_____
Paul D. Borman
United States District Judge

Dated:   December 2, 2013

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on December 2, 2013.

s/Deborah Tofil_____
Case Manager
